UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
BARBARA ANNE THOMAS,                          :
                                              :
                              Plaintiff,      :          **OPINION AND ORDER**
                                              :          17-cv-02813 (DLI)(AYS)
              -against-                        :
                                              :
TOWN OF HEMPSTEAD, KATE MURRAY,               :
ANTHONY SANTINO, GERRY MARINO,                :
MICHAEL PASTORE, GARRETT GORTON,              :
CRISSY ROSSELLI DEANGELO, RAYCHEL             :
RYCKMAN-MARTINO, MELISSA FOGARTY,             :
                                              :
                              Defendants.     :
-----------------------------------------------------------------x

**DORA L. IRIZARRY, United States District Judge:**

On May 9, 2017, Plaintiff Barbara Anne Thomas ("Plaintiff") filed this action pursuant to 42 U.S.C. § 1983 against the Town of Hempstead (the "Town"), Kate Murray ("Murray"), Anthony Santino ("Santino"), Gerry Marino ("Marino"), Michael Pastore ("Pastore"), Garrett Gorton ("Gorton"), and Melissa Fogarty ("Fogarty") (the "Town Defendants"), Crissy Rosselli DeAngelo ("DeAngelo"), and Raychel Ryckman-Martino ("Martino") (collectively, "Defendants"), alleging violations of her First Amendment rights to freedom of speech and access to the government and her Fourteenth Amendment right to equal protection of the laws, as well as a New York common law defamation claim. *See generally*, Complaint ("Compl."), Dkt. Entry No. 1. On June 29, 2018, the action against DeAngelo was dismissed on Plaintiff's stipulation. *See*, Dkt. Entry No. 33 and ECF Order dated June 29, 2018. Plaintiff's claims against Martino and Martino's counterclaims against Plaintiff were dismissed for failure to prosecute. *See*, ECF Order dated May 24, 2021. Only the Town Defendants remain.

The Town Defendants moved for summary judgment pursuant to Rule 56 of the Federal

Rules of Civil Procedure. *See*, Mem. of Law in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Mot."), Dkt. Entry No. 51-35. Plaintiff opposed the motion. *See*, Plf.'s Mem. of Law in Opp'n to Defs.' Mot. ("Plf.'s Opp'n"), Dkt. Entry No. 52. The Town Defendants replied. *See*, Mem. of Law in Further Supp. of Defs.' Mot. for Summ. J. ("Defs.' Rep."), Dkt. Entry No. 53. For the reasons set forth below, the Town Defendants' motion for summary judgment is granted and this action is dismissed in its entirety.

## BACKGROUND

The material facts are taken from the Town Defendants' Local Rule 56.1 statement and Plaintiff's response to the Town Defendants' 56.1 statement; *See*, Defs.' 56.1, Dkt. Entry No. 51-1 and Plf.'s 56.1, Dkt. Entry No. 52-1, respectively. The facts are undisputed unless otherwise stated. The Court has viewed the facts in the light most favorable to the Plaintiff, considered only facts recited by Plaintiff and the Town Defendants in their respective Rule 56.1 statements and responses that are established by admissible evidence, and has disregarded conclusory allegations and legal arguments contained therein. *See*, *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) ("[W]here there are no citations or where the cited materials do not support the factual assertions in the [s]tatements, the Court is free to disregard the assertion.") (citations omitted).

## I.    The Town of Homestead Animal Shelter and Plaintiff's Volunteer Work

Plaintiff resides in North Massapequa, New York. Plf.'s 56.1 ¶ 1. Plaintiff is an NYPD officer assigned as the Commanding Officer of the Animal Cruelty Investigation Squad. *Id.* ¶ 22. She is an advocate for animals and volunteered intermittently at the Town of Hempstead Animal Shelter ("TOHAS" or the "Shelter") from 2013-2016. *Id.* ¶¶ 23-24, 33. The Town is a municipal corporation and political subdivision of New York State and operates TOHAS. *Id.* ¶ 2. The Town must maintain an animal control function pursuant to New York State's Agriculture and Markets

Law.  *Id.* ¶ 11.  Section 123 of the Agriculture and Markets Law requires the Town to take into custody animals that are strays and/or deemed dangerous and sets forth conditions under which the Town must euthanize dangerous animals.  *Id.* ¶¶ 11-12.  Sections 117 and 374 outline the procedures for the humane destruction of animals.  *Id.* ¶ 12.

At all relevant times, Murray was the Town Supervisor until December 31, 2015, and Santino was the Town Supervisor from January 1, 2016 through December 31, 2017.  *Id.* ¶ 39. Kevin Denning ("Denning"), a non-party to this action, was Santino's executive assistant.  *Id.* ¶ 119.  Gorton was the Chief Investigator with the Town Attorney's Office.  *Id.* ¶ 7.  Marino was the Town Commissioner of General Services.  *Id.* ¶ 5.  Pastore replaced Cindy Iacopella ("Iacopella"), a non-party to this action, as the Shelter director.  *Id.* ¶¶ 6, 38.  Fogarty was a Town employee and kennel supervisor at the Shelter.  *Id.* ¶ 10.  Dolores Stormo ("Stormo") was the Shelter's volunteer coordinator.  *Id.* ¶ 28.  DeAngelo and Martino were volunteers.  *Id.* ¶¶ 8-9.

In June of 2013, Plaintiff began volunteering two to three days per week at TOHAS.  *Id.* ¶¶ 24, 36.  Plaintiff was trained in handling dogs, including walking them and taking them out of their cages.  *Id.* ¶ 30.  When Iacopella was the Shelter director, she furthered a humane concept of an animal adoption center, which aligned with Plaintiff's beliefs.  *Id.* ¶ 37.  This included the presence of a behaviorist, behavior programs and classes, teamwork, publications of newsletters and volunteers working at the Shelter's events.  *Id.*  Plaintiff believes that Pastore had a significantly different concept of an animal adoption center.  *Id.* ¶ 38.

## II. **Facebook Groups**

### A. **TOHAS Volunteers and Staff United**

Plaintiff was a member of a Facebook group called "TOHAS Volunteers and Staff United" run by DeAngelo.  *Id.* ¶ 47.  The group later was renamed "Nice People Who Walk Dogs."  *Id.* ¶

67. This group was not sponsored or sanctioned by the Town, TOHAS or Pastore. *Id.* ¶¶ 48, 54. DeAngelo is not a Town spokesperson and holds no official Town title. *Id.* ¶¶ 49, 54. DeAngelo shared information with the group about TOHAS' dogs and their behaviors. *Id.* ¶ 50.

In July 2015, DeAngelo notified all volunteers that two dogs would be euthanized without having received behavior evaluations and they were forbidden to tell the public because "the public will freak out." *Id.* ¶ 43; *See*, Deposition of Barbara Anne Thomas ("Plf.'s Dep."), Dkt. Entry No. 51-30, at 146: 18-19. When DeAngelo and other volunteers determined that Plaintiff shared this information with a friend, they posted pictures of rats in the Facebook group in response. Plf.'s 56.1 ¶ 44; Plf.'s Dep. at 146: 20-25; 147: 2-14. Plaintiff also received a private, unposted message online from Michael Whelan, a TOHAS staff member, stating that "[she] was a rat[,]" but she did not report this comment. Plf.'s 56.1 ¶¶ 45, 69; Plf.'s Dep. at 148, 4-5. Plaintiff considered the postings from the volunteers to be cyber stalking, but she did not report their conduct to the Nassau County Police Department ("NCPD") or the District Attorney's Office. Plf.'s 56.1 ¶¶ 44, 68.

A majority of the Facebook group's members voted not to retain Plaintiff in the group based on the wishes of DeAngelo and two other individuals not parties to this action. *Id.* ¶¶ 41, 55. Plaintiff claims she was removed after she spoke up about what "[she] felt was wrong at the shelter[.]" *Id.* ¶ 55; Plf.'s Dep. at 106: 10. The Town did not delete or remove Plaintiff from the group. Plf.'s 56.1 ¶ 56. Plaintiff believes that, while DeAngelo was free to delete Plaintiff from her Facebook group, Plaintiff was entitled to access information shared on the page as there were some unnamed staff members in the group. *Id.* ¶¶ 57-58.

On August 8, 2015, Plaintiff sent a letter to Stormo, complaining that DeAngelo's use of the Facebook group violated the TOHAS volunteer code of ethics. *Id.* ¶ 53. Plaintiff was upset with the comments made in the group about Plaintiff by DeAngelo and other volunteers. *Id.* ¶¶

61. Murray, Santino, Marino, and Pastore never wrote anything harmful or detrimental to Plaintiff on social media. *Id.* ¶ 73. Plaintiff's complaints were shared with Pastore who responded and requested additional information from Plaintiff and a time to meet. *Id.* ¶¶ 63, 65. However, Plaintiff did not provide any information to or schedule a meeting with Pastore. *Id.* ¶ 65.

### B. Buddy Up

The Buddy Up Program was created by a former TOHAS trainer. *Id.* ¶ 74. Volunteers would "buddy up" with different trainers and discussed the dogs they were walking in a Buddy Up Facebook group. *Id.* ¶¶ 74, 76. Fogarty assigned volunteers to dogs in person and online by using this Facebook group and shared information online with the group's members. *Id.* ¶¶ 78-79. Fogarty did not know who organized the Facebook group or if Plaintiff was a member and never has run any Facebook group relating to TOHAS. *Id.* ¶¶ 72, 76. Plaintiff was prohibited from accessing the group and Fogarty assigned her dogs only in person. *Id.* ¶¶ 77, 80, 82. Plaintiff claims that her exclusion from the group harmed her reputation and prevented her from "having information about the animals that [she] need[ed] to save them." *Id.* ¶¶ 81-82; Plf.'s Dep., Dkt. Entry No. 54-1 at 253: 20-22.

### III. The Kodi Memorial

Plaintiff created a memorial for a dog named Kodi in the woods behind TOHAS. Plf.'s 56.1 ¶ 83. After the memorial was destroyed, Plaintiff told Pastore she believed DeAngelo or two other volunteers possibly destroyed it. *Id.* ¶ 84. Pastore emailed Plaintiff and requested information about the memorial's destruction so that he could investigate and asked for Plaintiff's availability to meet and discuss her complaint. *Id.* ¶ 86. In response, Plaintiff submitted pictures of the memorial before and after the desecration and emailed Pastore about a group discussion on the internet, stating that DeAngelo and another volunteer "consider[ed] removing [the]

memorial[.]" *Id.* ¶ 87; Exhibit P to Defs.' Mot., Dkt. Entry No. 51-18, at 4. Plaintiff did not provide her availability to Pastore or meet with him. Plf.'s 56.1 ¶ 87.

## IV.     Restrictions on Plaintiff's Ability to Work with Animals

Pastore assigned Fogarty to oversee and organize the TOHAS volunteer program, which included Plaintiff. *Id.* ¶ 91. In January 2016, Fogarty investigated the volunteers' productivity, attendance and value to TOHAS. *Id.* ¶ 92. Plaintiff believes that Fogarty "set [] up" the investigation to try to "give away all of [her] buddies[]" to other volunteers. *Id.* ¶ 93; Plf.'s Dep., Dkt. Entry No. 54-1, at 255: 3-4. Plaintiff was restricted from working with three dogs at TOHAS: Pickles, Neeka and Ripley. Plf.'s 56.1 ¶¶ 89-90, 96-99. Pastore decided that Plaintiff could not work with Pickles because the dog had bitten someone. *Id.* ¶ 89. Plaintiff could not work with Neeka because she had escaped the kennel and needed to be restrained and Plaintiff was restricted temporarily from working with Ripley because Fogarty first needed to evaluate how Plaintiff took Ripley in and out of his cage. *Id.* ¶¶ 90, 97-99. Immediately, following the evaluation, Plaintiff was permitted to walk Ripley. *Id.* ¶ 98.

## V.     Town Hall Meetings

On June 7, 2016, Plaintiff began speaking out without restriction at Town Hall meetings about TOHAS. *Id.* ¶ 100. On July 13, 2016, Plaintiff spoke about conditions at TOHAS and requested that the Town release the list of animals scheduled to be euthanized. *Id.* ¶ 101. Plaintiff claims that she was mocked when she asked the Town Board to enforce a code of ethics and informed the Board that she would have no choice but to leave TOHAS because her NYPD job was jeopardized by "the craziness and the social media and the defamation[.]" *Id.* ¶ 102; Plf.'s Dep., Dkt. Entry No. 51-30, at 174: 23-24. DeAngelo and other volunteers cheered in the background and a person sitting next to Pastore took videos and pictures of Plaintiff and wrote a

nasty comment to Plaintiff online.  Plf.'s 56.1 ¶ 103.  Plaintiff chose to stop volunteering at TOHAS in or around August 2016.  *Id.* ¶¶ 104-05.

## VI.  <u>Martino's Social Media Post</u>

On August 10, 2016, Plaintiff emailed Santino regarding a social media post that Martino sent to Plaintiff, which Plaintiff considered a form of harassment and a violation of the TOHAS code of ethics.  *Id.* ¶ 107.  The post stated the following:

> "[Barbara] Anne Thomas yes . . . [I']m very aware how members of your group twist and turn facts and point fingers and make horrible accusations and threaten physical violence and cut good people down all in the name of dogs. It['s] very scary a[c]tually. You guys all remind me of the anti-abortionists that go around killing doctors that perform abortions. You're a group of very scary people. Soo . . . Ummm . . . yea . . . [I']m very aware . . . . and [I] wonder why [yo]u had to turn this into this??? Smh . . . here we go!!"

*Id.* ¶ 108.  Plaintiff claimed Martino called her a "terrorist" because Martino said Plaintiff was in a group that threatens physical violence.  *Id.* ¶¶ 107, 115.  Plaintiff requested that Santino suspend Martino immediately from the TOHAS volunteer program.  *Id.* ¶ 107.  Plaintiff also informed Santino that she would file a police report against Martino, but she never did.  *Id.* ¶¶ 115-16.

On August 18, 2016, Plaintiff met with the Town Investigator to provide him with a written statement about her complaints.  *Id.* ¶ 118.  Denning contacted Plaintiff about her email complaint to Santino, spoke with her on the phone on several occasions and advised Plaintiff that he would meet with her.  *Id.* ¶ 119.  Plaintiff never scheduled a time to meet with Denning.  *Id.*

## VII.  <u>Incident at TOHAS on February 18, 2017</u>

On February 18, 2017, Plaintiff attended an afternoon cat socialization session at TOHAS run by Stormo.  *Id.* ¶ 122.  Fogarty was the only supervisor on duty that day.  *Id.* ¶ 123.  Martino was present and recorded the session.  *Id.* ¶¶ 124, 127.  She recorded the session, among other reasons, because "things get twisted around," there were people "that d[id]n't care for [her]" and she was "concerned that it was going to come out that possibly we were doing something that we

shouldn't have been doing or something was wrong." *Id.* ¶ 127; *See*, Deposition of Raychel Ryckman-Martino ("Martino Dep."), Dkt. Entry No. 51-34, at 36: 18-23.

When the session ended, Plaintiff and Stormo asked Martino if she had recorded the session, and Martino confirmed that she had. Plf.'s 56.1 ¶ 131. Plaintiff and Stormo were standing between Martino and the room's exit and Martino had to pass them both to exit. *Id.* ¶ 132. Other volunteers also were standing in the doorway. *Id.* ¶ 133. Martino became "scared and nervous" and felt that she could not leave the room. *Id.* ¶ 134; Martino Dep. at 43: 21-25. Plaintiff then began to yell at her and put her finger in Martino's face. Plf.'s 56.1 ¶ 135. Martino yelled for help and, as a result, the group dispersed and Martino was able to exit the room. *Id.*

A volunteer informed Fogarty about the incident and Fogarty called Pastore to inform him. *Id.* ¶¶ 137, 139. Fogarty also called the Town's public safety division and Marino. *Id.* ¶¶ 139-141. Fogarty told public safety that "an argument had occurred and that's all [she] really knew." *Id.* ¶ 141; *See*, Deposition of Melissa Fogarty ("Fogarty Dep."), Dkt. Entry No. 51-33, at 35: 10-11. Plaintiff called the NYPD and the NCPD. Plf.'s 56.1 ¶¶ 144, 146. When the Town's public safety officers arrived, they told Plaintiff that she "[was]n't allowed to be there, [she was] not allowed in the [S]helter, [and to] get off the property." *Id.* ¶ 147; Plf.'s Dep., Dkt. Entry No. 51-30, at 217: 13-14. One of the officers also told her that a staff member inside "called on [her]" and "want[ed] [her] to leave." Plf.'s 56.1 ¶ 148; Plf.'s Dep., Dkt. Entry No. 51-30, at 218: 17-20; 229: 19. The officer's statement as to what the officer was told by an unnamed TOHAS staff member is hearsay that would not be admissible at trial. *See*, *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir. 1999). The Court, thus, declines to consider it.

The Town Defendants produced a security video recording taken at TOHAS of the February 18, 2017 incident. *See*, Exhibit W to Defs.' Mot., Dkt. Entry No. 51-25. Plaintiff objects

to the videotape on the grounds that it was not properly authenticated and constitutes inadmissible hearsay. *See*, Plf.'s Opp'n at 14-15. The Court disagrees. Plaintiff does not dispute the Town Defendants' description of the recording's content. *See*, Plf.'s 56.1 ¶¶ 154-58. Pastore also submitted an affidavit attesting that the recording accurately captures what occurred at the Shelter on February 18, 2017. *See*, Dkt. Entry No. 53-2. A reasonable trier of fact could find that Pastore, as the Shelter director, had personal knowledge about the number, maintenance, location and recording capacity of the cameras at TOHAS. Pastore reviewed the recording and can testify as to its content. Thus, Pastore's affidavit and his assertions about the recording are admissible. *See*, Fed. R. Civ. P. 56(c)(4); *Madden v. Town of Hempstead*, 2019 WL 1439935, at *12 (E.D.N.Y. Mar. 29, 2019).

In addition, the security video recording, which does not contain any audio, is not hearsay. Hearsay is defined as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). "Statement" is defined as "a person's oral assertion, written assertion, or nonverbal conduct, *if the person intended it as an assertion*." Fed. R. Evid. 801(a) (emphasis added). Nothing in the video can be construed as nonverbal conduct which Plaintiff, or any other person depicted therein, intended to be an assertion. It does not constitute a "statement" within the meaning of Rule 801. *See*, *Madden*, 2019 WL 1439935, at *3 n.6. Accordingly, the Court may consider the video recording in deciding this motion.

The video shows Plaintiff and another volunteer, Dianne Madden, walking in a TOHAS hallway at 3:37pm. Plf.'s 56.1 ¶ 154. They were joined by Stormo and others and the group can be seen standing together in the hallway laughing. *Id.* ¶ 155. They exited TOHAS and remained in and around the front entrance. *Id.* ¶¶ 156-57. Public safety officers and NCPD officers entered

and exited the building and stopped to speak with the group several times from approximately 3:40pm to 5:50pm. *Id.* ¶ 157. After approximately two hours and ten minutes of standing in and around the front entrance and the parking area of TOHAS, Plaintiff entered her vehicle and drove away at 5:55pm. *Id.* ¶ 158. Plaintiff never was told by public safety, Marino, or anyone else that she was not permitted to return to TOHAS. *Id.* ¶¶ 162-64. Plaintiff's allegation that she was "banned" was her "interpretation" that she could not return because volunteering there could put her job at the NYPD in jeopardy. *Id.* ¶¶ 167-68; Plf.'s Dep., Dkt. Entry No. 54-1, at 237: 19.

**VIII.**   <u>**Investigation of February 18, 2017 Incident and Subsequent Actions**</u>

Gorton called NYPD's Internal Affairs Bureau ("IAB") about the February 18, 2017 incident at TOHAS because, as he described, "[t]here was an allegation that [Plaintiff] was threatening someone, identified herself as a police officer, and that is conduct unbecoming of a police officer." Plf.'s 56.1 ¶ 171; *See*, Deposition of Garrett Gorton ("Gorton Dep."), Dkt. Entry No. 51-32, at 15: 14-17. Plaintiff believes that by reporting the incident and providing IAB Martino's contact information, Gorton intended to jeopardize Plaintiff's job and have her banned from TOHAS. Plf.'s 56.1 ¶¶ 172-73. The IAB never interviewed or disciplined Plaintiff. *Id.* ¶ 177. The Town investigated the incident, but did not contact or discipline Plaintiff. *Id.* ¶¶ 106, 181, 183. Plaintiff claims that she was harassed and retaliated against in May 2017 when Martino followed her around an adoption fair and other volunteers continued "posting things" on the internet. *Id.* ¶ 184; Plf.'s Dep., Dkt. Entry No. 54-1, at 301: 13. Plaintiff did not report those incidents and ultimately retired from the NYPD in July 2018. Plf.'s 56.1 ¶¶ 184-85.

<u>**LEGAL STANDARD**</u>

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). "In ruling on a summary judgment motion, the district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment and determine whether there is a genuine dispute as to a material fact, raising an issue for trial." *McCarthy v. Dun & Bradstreet Corp.*, 482 F. 3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted). A fact is "material" within the meaning of Rule 56 when its resolution "might affect the outcome of the suit under the governing law[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

To determine whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." *Cronin v. Aetna Life Ins. Co.*, 46 F. 3d 196, 202 (2d Cir. 1995) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam) and *Ramseur v. Chase Manhattan Bank*, 865 F. 2d 460, 465 (2d Cir. 1989)). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The moving party bears the burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). Once the moving party has met its burden, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'"

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis omitted). The nonmoving party must offer "concrete evidence from which a reasonable juror could return a verdict in h[er] favor." *Anderson*, 477 U.S. at 256. The nonmoving party may not "rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible, or upon the mere allegations or denials of the [nonmoving] party's pleading." *Ying Jing Gan v. City of New York*, 996 F. 2d 522, 532-33 (2d Cir. 1993) (citations and internal quotation marks omitted). "Summary judgment is appropriate only '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F. 3d 134, 141 (2d Cir. 2012) (quoting *Matsushita*, 475 U.S. at 587).

Federal Rule of Civil Procedure 56 provides that, in moving for summary judgment or responding to such a motion, "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or showing that the materials cited do not establish the absence or presence of a genuine dispute, or than an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A-B). "An affidavit or declaration used to support or oppose a [summary judgment] motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

Rule 56's requirement that "affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief.'" *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 219 (2d Cir. 2004) (citing *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988)).

If assertions in an affidavit "are not based upon the affiant's personal knowledge, contain inadmissible hearsay, or make generalized and conclusory statements[,]" a court may strike those portions of the filing, or decline to consider those portions that are not based on personal knowledge or are otherwise inadmissible. *Serrano*, 863 F. Supp.2d at 163 (citations omitted). While the Court need consider only the materials cited by the parties, it may consider any other materials in the record in deciding a summary judgment motion. Fed. R. Civ. P. 56(c)(3).

## **DISCUSSION**

Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan,* 443 U.S. 137, 145 n.3 (1979). Section 1983 provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . . 42 U.S.C. § 1983.

To state a Section 1983 claim, Plaintiff must show "that (1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Snider v. Dylag,* 188 F.3d 51, 53 (2d Cir. 1999). It is well established that Section 1983 "constrains only state conduct, not the 'acts of private persons or entities[.]'" *Hooda v. Brookhaven Nat'l Lab.*, 659 F. Supp.2d 382, 393 (E.D.N.Y. 2009) (quoting *Rendell-Baker v. Kohn*, 457 U.S. 830, 837 (1982)). Accordingly, "a litigant claiming that h[er] constitutional rights have been violated must first establish that the challenged conduct constitutes state action." *Flagg v. Yonkers S&L Ass'n*, 396 F.3d 178, 186 (2d Cir. 2005) (internal quotation marks and citation omitted). Indeed,

"the under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful[.]" *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (internal quotation marks and citations omitted).

# I       First Amendment

## A.       Access to Government Claim

The First Amendment prohibits Congress from "abridging the freedom of speech, or of the press" and guarantees "the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Cons. Amend. I. "The right of peaceable assembly is a right cognate to those of free speech and free press and is equally fundamental." *De Jonge v. Oregon*, 299 U.S. 353, 364 (1937). However, "[n]othing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799-800 (1985).

"[T]he government is permitted to exercise control over the public's use of government-owned property for expressive purposes, and the degree of control permitted depends upon the nature of the property and the speech restrictions imposed thereon." *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 341 (2d Cir. 2010) (citation omitted); *See also*, *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983) ("The existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue.").

The Supreme Court has recognized "three types of government-controlled spaces: traditional public forums, designated public forums, and nonpublic forums." *Minn. Voters All. v.*

*Mansky*, 138 S. Ct. 1876, 1885 (2018); *See also*, *Johnson v. Perry*, 859 F.3d 156, 171 (2d Cir. 2017) ("[S]peech restrictions imposed on persons on government-owned property are analyzed under a forum-based approach that divides government property into three principal categories — the traditional public forum, the designated public forum, and the nonpublic forum, along with a subset of the designated public forum, referred to as the limited public forum[.]") (internal quotation marks, alterations and citation omitted).

Traditional public fora include areas such as "streets, parks, and the like [] which have immemorially been held in trust for the use of the public and . . . have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. In these fora, content-based restrictions will be upheld only if they are necessary to serve a compelling state interest and are narrowly drawn to achieve that end." *Peck v. Baldwinsville Cent. School Dist.*, 426 F.3d 617, 625-26 (2d Cir. 2005) (internal quotation marks and citation omitted). "A designated public forum is a place not traditionally open to public assembly and debate . . . that the government has taken affirmative steps to open for general public discourse. Speech in a designated public forum is entitled to the same constitutional protection as that extended to expression in a traditional public forum, so long as the state continues to designate the forum for such use." *Id.* at 626 (internal quotation marks and citation omitted).

A limited public forum is created when the State "opens a non-public forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects." *Id.* (citation omitted). In a limited public forum, regulations governing the content of speech are allowed, so long as they are "reasonable" and "viewpoint neutral." *Id.* (citation omitted). A nonpublic forum is one that is "neither traditionally open to public expression nor designated for such expression by the State." *Id.* In such a forum, as in a limited public forum, content

regulations are allowed, if they are reasonable and viewpoint neutral. *Id.*

"Accordingly, the initial task of a court faced with a dispute regarding First Amendment activity on government property is to define the nature of the property at issue." *Zalaski*, 613 F.3d at 341. "In conducting forum analysis, [courts] examine a variety of factors, including the forum's physical characteristics and the context of the property's use, including its location and purpose. [Courts] have held that the primary factor in determining whether property owned or controlled by the government is a public forum is how the locale is used. Also relevant is the government's intent in constructing the space and its need for controlling expressive activities on the property, as evidenced by its policies or regulations. Finally, [courts] consider whether the property in question is part of a class of property[,] which by history or tradition has been open and used for expressive activity." *Id.* at 342 (internal quotation marks and citations omitted).

Plaintiff's First Amendment access to government claim is premised upon the Town Defendants allegedly banning her from TOHAS and removing her from the facility on February 18, 2017. Compl. ¶ 40. TOHAS is not a traditional public forum, such as a street or public park, as it is not used by the public for "purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Peck*, 426 F.3d at 626. TOHAS also is not a designated public forum. There is no evidence in the record that supports the contention that the Town took "affirmative steps" to open the Shelter for "general public discourse." *Id.*

The Town maintains an animal control function at TOHAS by taking into custody stray animals and euthanizing dangerous animals as required by the New York State Agriculture and Markets law. Plf. 56.1 ¶¶ 11-12. That is the Shelter's sole purpose. Thus, the Shelter is a nonpublic forum and, "at most, . . . would be a limited public forum." *Madden*, 2019 WL 1439935,

at *15; *See also*, *Hansen v. Town of Smithtown*, 342 F. Supp.3d 275, 291-92 (E.D.N.Y. 2018) (applying judicial scrutiny standard applicable to a limited public forum to Town of Smithtown's animal shelter). The same level of judicial scrutiny is applicable to both nonpublic fora and limited public fora. Therefore, the Town Defendants' restrictions on Plaintiff's speech at TOHAS, if any, must be reasonable and viewpoint neutral. *Peck*, 426 F.3d at 626.

Plaintiff did not present any evidence that the Town Defendants banned her from TOHAS. The Town Defendants never communicated to Plaintiff that she was banned. Plf.'s 56.1 ¶¶ 162-64. Plaintiff's allegation that she was "banned" is her "interpretation" and does not derive from any order or instruction from the Town Defendants. *Id.* ¶ 167; Compl. ¶ 37. Plaintiff chose to stop volunteering at TOHAS. Plf.'s 56.1 ¶¶ 102, 105. With respect to the February 18, 2017 incident, Plaintiff does not allege that the Town Defendants removed her from TOHAS based on the content of her speech or expressive conduct. Plaintiff also does not identify who escorted or removed her from the Shelter. Indeed, the video recording reveals that, in fact, she was not removed. After standing in and around the front of TOHAS for over two hours, Plaintiff voluntarily entered her vehicle and drove away. *Id.* ¶ 158. Even if the Court were to determine that Plaintiff was removed from TOHAS, her removal was viewpoint neutral and reasonable, as she was involved in an altercation with Martino. *Id.* ¶ 134-35. Based on these facts and circumstances, Plaintiff cannot establish that she was banned or removed from TOHAS by the Town Defendants. Accordingly, Plaintiff's First Amendment access to government claim is dismissed.

### B.     Retaliation Claim

To prevail on a First Amendment retaliation claim, Plaintiff must prove that: "(1) [s]he has a right protected by the First Amendment; (2) the defendant[s'] actions were motivated or

substantially caused by h[er] exercise of that right; and (3) the defendant[s'] actions caused h[er] some injury." *Dorsett v. Cnty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013) (citing *Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001)). "Specific proof of improper motivation is required in order for plaintiff to survive summary judgment on a First Amendment retaliation claim." *Curley*, 268 F.3d at 73 (citing *Blue v. Koren*, 72 F.3d 1075, 1082-83 (2d Cir. 1995)). To demonstrate an injury, plaintiff must show "either that h[er] speech has been adversely affected by the government retaliation or that [s]he has suffered some other concrete harm." *Dorsett*, 732 F.3d at 160 (emphasis omitted).

Plaintiff alleges that she was retaliated against by the Town Defendants for reporting instances of animal abuse and neglect at the shelter, questioning the allocation of funds in the shelter's budget, and lobbying for the implementation of certain operational programs. Compl. ¶ 42. The Town Defendants do not dispute that Plaintiff has a First Amendment right to speak out about matters of public concern regarding the Shelter. *See*, Defs.' Mot. at 22. They contend, however, that Plaintiff cannot show that the Town Defendants took actions that were motivated improperly by Plaintiff's speech or that Plaintiff suffered an injury. *Id.* The Court agrees.

Plaintiff cannot show that the Town Defendants took any adverse action against Plaintiff based on her exercise of her First Amendment rights. As discussed above, there is no evidence that the Town Defendants banned or removed Plaintiff from TOHAS. With respect to social media, DeAngelo ran the TOHAS Volunteers and Staff United Facebook group. Plf.'s 56.1 ¶ 47. DeAngelo was a TOHAS volunteer and not a Town spokesperson. *Id.* ¶¶ 8, 54. The Town did not remove Plaintiff from this group and DeAngelo's private page was not sanctioned or sponsored by the Town, TOHAS or Pastore. *Id.* ¶¶ 48, 54, 56. Plaintiff also cannot show that any of the Town Defendants blocked or prevented her from joining the Buddy Up Facebook group. While

Fogarty used this page to assign volunteers to animals, Fogarty did not run this page or know if Plaintiff was a member. *Id.* ¶¶ 72, 76. Plaintiff further claims that she generally was subjected to vicious, defamatory and threatening comments on social media, but these comments were made by volunteers and not Town staff. *Id.* ¶ 61. Pastore, Murray, Santino, and Marino never wrote anything harmful or detrimental to Plaintiff on social media. *Id.* ¶ 73.

Plaintiff identified several other arguably retaliatory actions, including the destruction of the Kodi memorial, the restrictions on Plaintiff's ability to work with certain animals, and the complaint filed by Gorton against Plaintiff with the IAB. However, there is no evidence that any of the Town Defendants desecrated the Kodi memorial or that the restrictions on Plaintiff's ability to work with Pickles, Neeka and Ripley were motivated by Plaintiff's speech. *Id.* ¶¶ 85, 89-90, 97-98. Plaintiff claims that Pastore failed to investigate properly Plaintiff's complaints regarding the Kodi memorial and the social media comments from other volunteers, but her assertion is belied by the record. Pastore responded to her complaints and followed up with Plaintiff, but Plaintiff did not meet with Pastore or provide certain information that he requested. *Id.* ¶¶ 65, 86-87. Denning also contacted Plaintiff about her complaint to Santino, spoke with her several times, and advised that he would meet with her, but Plaintiff did not schedule a time to meet. *Id.* ¶ 119.

Gorton's complaint against Plaintiff with the IAB was based on an allegation that Plaintiff had threatened someone and identified herself as a police officer in doing so. *Id.* ¶ 171. The nature of the threat is unclear. *See*, *Roth v. Farmingdale Pub. Sch. Dist.*, 2017 WL 395211, at *16 (E.D.N.Y. Jan. 30, 2017) ("[T]hreats of violence are not secured by the First Amendment."). Nevertheless, even if the Court were to determine that this alleged threat was protected speech under the First Amendment, the IAB never questioned, disciplined, or terminated Plaintiff as a result of Gorton's complaint. Plf.'s 56.1 ¶ 177-78. Thus, Plaintiff cannot demonstrate an injury

arising from this action.

Finally, Plaintiff does not allege that her speech has been affected adversely and she cannot show that she suffered some other concrete harm. While Plaintiff claims that her reputation has been "questioned" by others, she has not proffered any evidence in support of this conclusory claim. *See*, *Maco v. Baldwin Union Free Sch. Dist.*, 249 F. Supp.3d 674, 679-80 (E.D.N.Y. 2017) (granting defendants' motion for summary judgment on plaintiff's First Amendment retaliation claim where plaintiff failed to adduce any evidence that her reputation and standing in the community were damaged). Plaintiff's cursory and conclusory allegations of emotional and psychological harm also are insufficient to plead injury. *See*, *Zherka v. Amicone*, 634 F.3d 642, 646-47 (2d Cir. 2011). Accordingly, Plaintiff's First Amendment retaliation claim is dismissed.

## II.     Fourteenth Amendment - Equal Protection Claim

"The Equal Protection Clause 'is essentially a direction that all persons similarly situated should be treated alike.'" *Lanning v. City of Glens Falls*, 908 F.3d 19, 29 (2d Cir. 2018) (quoting *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985)). "[E]qual protection jurisprudence has typically been concerned with governmental classifications that affect some groups of citizens differently than others." *Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591, 601 (2008) (internal quotation marks and citation omitted). However, "an equal protection claim can . . . be sustained even if the plaintiff has not alleged class-based discrimination, but instead claims that she has been irrationally singled out as a so-called 'class of one.'" *Id.* To prevail on an equal protection claim based on selective enforcement, plaintiff must show "(1) that [she was] treated differently from other similarly situated individuals, and (2) that such differential treatment was based on impermissible considerations such as . . . [the] intent to inhibit or punish the exercise of constitutional rights[.]" *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499

(2d Cir. 2001) (internal quotation marks and citations omitted).

The Supreme Court has "recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and [] there is no rational basis for the difference in treatment." *Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). "To establish a class-of-one claim, a plaintiff must show an extremely high degree of similarity between [her]self and [her] comparators." *NRP Holdings LLC v. City of Buffalo*, 916 F.3d 177, 198 (2d Cir. 2019) (internal quotation marks and citation omitted). Plaintiff must establish that "(i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake." *Id.* (quoting *Fortress Bible Church v. Feiner*, 694 F.3d 208, 222 (2d Cir. 2012)).

Plaintiff alleges that her rights under the Equal Protection Clause of the Fourteenth Amendment were violated because the Town Defendants banned Plaintiff from volunteering at TOHAS and permitted similarly situated rescuers to enter TOHAS. Compl. ¶ 44. As already discussed, there is no evidence that the Town Defendants banned or removed Plaintiff from TOHAS. Plf.'s 56.1 ¶¶ 158, 162-64. With respect to this claim, Plaintiff also has not identified a single comparator who was treated differently than she was under sufficiently similar circumstances. *Id.* ¶ 166. Therefore, Plaintiff's Equal Protection claim is dismissed.

## III.    *Monell* **Claims**

Plaintiff has failed to establish an underlying constitutional violation committed by Murray, Santino, Marino, Pastore, Gorton, or Fogarty. Accordingly, Plaintiff's *Monell* claims against the Town are dismissed. *See*, *Lanning*, 908 F.3d at 30; *Segal v. City of New York*, 459 F.3d

207, 219 (2d Cir. 2006).

## IV.    **Defamation Claim**

"To state a claim for defamation under New York law, the plaintiff must allege (1) a false statement about the plaintiff; (2) published to a third party without authorization or privilege; (3) through fault amounting to at least negligence on [the] part of the publisher; (4) that either constitutes defamation per se or caused special damages." *Thomas v. City of New York*, 2018 WL 5791965, at *6 (E.D.N.Y. Nov. 5, 2018) (internal quotation marks and citations omitted).  The Complaint does not identify any written or oral statements made by the Town Defendants that Plaintiff considered defamatory.  Plaintiff alleged only that TOHAS volunteers, not staff members, defamed her.  Plf.'s 56.1 ¶ 61.  Defendants Murray, Santino, Marino and Pastore did not write anything harmful or detrimental to Plaintiff on social media.  *Id.* ¶ 73.  Accordingly, Plaintiff's defamation claim against the Town Defendants is dismissed.

## CONCLUSION

For the reasons set forth above, the Town Defendants' motion for summary judgment is granted and this action is dismissed in its entirety with prejudice.

SO ORDERED.

Dated: Brooklyn, New York
         June 4, 2021

_____
               /s/
       DORA L. IRIZARRY
    United States District Judge
